The first case to be argued today is 20-1312 Phoenix Light v. U.S. Bank National. Appellant can begin. Mr. Honors, good morning. William Marr on behalf of plaintiff's appellants. The fundamental error of the district court on summary judgment was its ruling that plaintiffs transferred all of their pre-existing proprietary interests to their indenture trustees when they securitized their RMBS certificates in the CDO transactions. That is a clear error of law which conflicts with the law of the circuit including the court's recent decisions in SM Kids in 2020 and fund liquidation in 2021. Counsel, I have a question. There's a lot about this case that I have a hard time understanding but you say in your brief that the indenture trustees could not bring this action because they suffered under a conflict of interest. What is that conflict of interest? You also direct me to the testimony which I read which doesn't describe the conflict of interest. Your honor, the conflict of interest is actually set out in specifically in our letters to the indenture trustees were at A511, A537, and A556. Those trustees themselves had been sued for the exact same conduct that U.S. Bank engaged in in this case and they had taken positions in those litigations already which were contrary to the positions that were going to have to be taken in the litigation in order to pursue the claims against the indenture trustee. Well, thank you. Go on. Very well, your honor. So the court's decisions in SM. Let me just follow up on that. That doesn't take away from the fact that the assignment was for the purpose of litigation for bringing the lawsuit. I understand there may have been an issue about a conflict but for purposes of champerty would be whether or not the purpose was to bring the litigation, right? Well, your honor, the purpose broadly was that we needed somebody who could act and the act is bring litigation, right? Well, it didn't necessarily have to be bring litigation. If they had been acting to protect the collateral, they could have negotiated, they could have done a lot of things in order to enforce the rights under the trust indenture. But the assignment says in response to the opinion of the district court judge, it was clearly in this particular case for the purpose of bringing litigation maybe because it was a conflict but for whatever reason, it certainly was for the purpose of bringing this lawsuit, right? Yes. And love funding holds that a litigation purpose is not sufficient to find champerty. What you need is if you have a pre-existing proprietary interest in the claims or in the transactions. Which Phoenix did. Which Phoenix did. You are outside the prescription of champerty even if you have the assignment for purposes of a lawsuit. Why didn't you waive that particular argument? Actually, you acknowledged in your brief that these theories of proprietary interest, you did not raise until the motion for reconsideration, the 59 motion, right? Not true, your honor. In fact, in our brief, which is ECF 320 on summary judgment, we raised specifically that the issuer of a CDO was injured by actions that adversely affect the collateral. We argued that we actually- In the section on champerty, you specifically relied upon the fact that you had a property interest retained. That was what you relied on in response to the champerty argument. I looked at it myself. I went back to the opposition for summary judgment. There were two pages that you responded to champerty and that was the only argument that you made. You cited about funding, but the theory of the exception was that you had a property interest, that you were saying you retained title somehow, which- No, no, your honor. What we said is we are injured. In fact, we cited Judge Sullivan's decision in the district court in House of Europe. We said that the issuer is injured by actions that adversely affect the collateral. That gives us a proprietary interest. At summary judgment oral argument, US Bank also conceded that we have a reversionary interest in the collateral. That's at A2805 of the record. On page six of your brief, where it's about the champerty argument, you say, like the trust and love funding, plaintiffs have property interests in the RMBS certificates at issue. That was the position that you took. You have a proprietary interest, your honor. That's not what you wrote. You wrote a property interest. Look at the brief, your honor, that we actually argued that the same proprietary interest that give us Article III standing also support our champerty argument. That's at approximately page six of our brief on summary judgment. We argued that we have received- I don't want to take up all your time on this. I understand. Keep going. Your honor, we argued that we get the income in principle from the RMBS certificates flow through us in a trust account to the bondholders. We actually get the cash flows from the RMBS certificates and they are transferred through the securitization process, through the lockbox of the trustee to the bondholders. We have account statements saying that these RMBS certificates are in our collateral pools. Significantly at oral argument, US Bank conceded that we have Article III standing under this at the time. That's at A2803 of the record. They then went on to concede in front of Judge Broderick that we have a reversionary interest in the collateral. That's at A2805 of the record. Both what we argued and what US Bank conceded at oral argument and summary judgment is more than sufficient to give us both a proprietary interest in order to sustain our injury in fact and Article III standing and to defeat a champerty affirmative defense as a matter of law. Why the fact that you have Article III standing necessarily mean that you have contractual standing? You can't fight both of those arguments. They're two separate things, right? Joe Caprani's decision for the court in Huff holds that a minimum standard for Article III jurisdiction is a proprietary interest. We have a proprietary interest. We have injury in fact and therefore we have Article III standing. The standard for to be outside the bounds of champerty is much, much lower than Article III standing. It's any connection or relationship to a transaction. By definition, if we have injury in fact to have sufficient Article III standing, we automatically defeat champerty defense as a matter of law. That is what Love Funding basically holds. Love Funding cited the standing what you're saying. If you are harmed, okay, you have a property interest and you're harmed, that creates Article III standing. But then if you assign all your rights away with respect to that property, it could be that you don't have prudential standing or contractual standing because you assigned it away or my missus. We clearly do not have contractual standing once we assigned all right title and interest to the trustees. We can see that. We got a reassignment back. The reassignment is what they're claiming is champerty, but we have independent proprietary interest both in our relationship with our indenture trustees, which is a separate line of the champerty issue. The Court of Appeals collected 10 cases roughly in page two. Can you explain how your clients would suffer harm? What would the harm that I know you say that there's obligations, but explain rather than being a flow through, how they would be harmed? Pecuniary harm or some other type of harm? A CDO issue, this is what Judge Sullivan held in House of Europe. A CDO issuer is harmed by actions that adversely affect the collateral. We have obligations under the CDO indenture to protect the collateral and ensure that the rights are enforced. We have an existing relationship with our indenture trustees. We are not a stranger to this transaction. The fact that we may not suffer a pecuniary injury is irrelevant because the US Supreme Court in Sprint held- Well, did you or did you not suffer injury? You were answering Judge Bianco's question, and now you're saying it doesn't make a difference if you did or you didn't. It's suffer injury because the CDO issuer by definition is injured by any injury to the collateral. At the end of the day, the assets revert to us. Once the bondholders are paid, the assets revert to the issuer. What the Supreme Court has held that a pass-through entity, even if we wind up giving the assets to somebody else, Sprint held, what does it matter what they do with the assets afterwards? Judge Capran in Huff quoted the Supreme Court admonition and Judge Sullivan in the District Court and House of Europe said the same thing. If that were true, a pass-through entity would never have Article III standing because you're saying they could never suffer any harm personally. That's not the issue. The issue is we have assets, we have things that we have to do, and the assets are diminished and we are harmed. Tamar, your time is up. I've given you some extra time, of course. You've reserved a bit of time, I think. Let's see. Very well, Your Honor. Two minutes. Yes, Your Honor. In counsel. Good morning. May it please the court. Louis Chaitin for US Bank. I'd like to begin by on the performance of the collateral and that they really are strangers to any dispute with US Bank over the performance of the collateral. Didn't they retain an interest? No, that's incorrect, Your Honor. Tell me why. The indenture trustees, not the issuer, hold the collateral. That's under the granting clauses and the definition of grant. The issuer is not responsible for payments to the note holders. We explain this in our brief. These are limited recourse vehicles. So if there's not enough to pay the note holders, the note holders can't come after the issuers. They're limited to the collateral. And then the trustee is the one who actually pays the note holders from the payment account that it holds. That's at page 20401 of the joint appendix and 2077 of the joint appendix. And if in the future any collateral happens to be left over after the notes are fully paid, it goes to the note holders. The issuer doesn't get to keep it. And so they really have no interest whatsoever in the performance of the collateral. But regardless of all of that, it's one thing that's clear in this case is they needed assignments to sue. And so they obtained a sign. Can you just do you want to distinguish the cases that you're Mr. Mayor cited that said Judge Sullivan's case? Sure, I'd be happy to distinguish those cases. And actually, if I could explain, I mean, I think the argument they're making is that they have, they supposedly have article three standing even without the assignments, right? And that that somehow makes the assignments not chamfered. Well, so a few things to say about that. One, it's a doubly waived argument because they didn't argue this in opposition to summary judgment. And then in their motion for reconsideration, they accused the district court of getting it wrong by somehow equating the test for article three standing with the test for champerty. Article three, the test for article three standing is not the test for champerty. The test for champerty is whether the primary purpose is for litigation and plaintiffs witnesses admitted that the primary purpose is for litigation here. And in any event, plaintiffs lack article three standing without the assignments. I mean, maybe the assignments give them article three standing, but they didn't have article three standing without the assignments. And the reason for that is actually quite simple. It's not the main reason is not because they granted away their right to bring litigation. It's because or that the never had an article three injury in fact, to begin with. And the reason is that many years ago, when they acquired the RMBS, they instantaneously transferred it away, granted it away under the granting clauses. And in this case, they say they are only seeking losses suffered while they held the certificates. This is explained in judge Forrest's decision on the second motion to dismiss. It's at a special appendix page 59. And so they're only seeking losses for while they held the certificate. That's what they say, but they held for only a moment many years ago. And there's no evidence that there were any losses while they held. And the other injuries, their supposed injuries that they're talking about are future and speculative. If in the future, there happens to be something left over, after all the notes are paid, that it goes through the issuer to the note holders. Well, it's completely speculative. And most importantly, it's a future injury. And under the supreme opposing counsel says they held a proprietary interest in the CDOs, even though they transfer them to the indenture trustee, that they had some interest remaining beyond litigation. They don't. That's incorrect. They have no interest in the performance of this collateral, none whatsoever. And they were designed to be this way. They're limited recourse vehicles. So the note holders are limited to the collateral, their recourse is limited to the collateral, and the indenture trustee holds the collateral. And they're wrong that just by being an issuer, their position seems to be we're a CDO issuer. And so by definition, we have article three standing even without assignments, but article three standing is not dispensed in gross, it's claim specific. And so this case is very different from the cases they rely on. So for example, in FDIC, one of the cases they rely on, FDIC suffered $50 million in losses itself before it assigned away its rights. So it has article three standing, even though it assigned away the rights, arguably. Fund liquidation. Fund liquidation is a case in which the original plaintiffs suffered losses themselves, suffered an article three injury before they assigned away their rights. They mentioned SM Kids. SM Kids is a case where the plaintiff was running a business for kids programming, and they say Google injured that business. That is an article three injury that they have on their own. And House of Europe and Hildeen are completely different cases. Those are cases where there's a suit by the issuer against the indenture trustee for breach of the indenture to which they're both parties. And that's not this case. Plaintiffs are suing over something to which they really are a stranger. They're a stranger because they have no interest in any dispute with the US Bank over the performance of the collateral. You mentioned SM Kids. I just wanted to ask you procedurally, and I know you say hillside, but it seems to me that those cases are a little bit irreconcilable. In other words, whether we can standing. Do you want to address that? I'm sorry about that. Can you still hear me? Apologies. SM Kids does not address the order in which the court needs to address issues at all. It doesn't say anything about that. No, but it does say it's a merits-based determination, which would suggest that you should. And in that case, it was different in the sense that it was merits-based in that the underlying prudential standing issue turned on whether they have a claim under the Lanham Act, which is different than the threshold prudential standing we're dealing with here. And hillside says that this type of issue is a prudential standing issue and that it can be decided before article three. And hillside is not just saying that on its own, it's relying on Supreme Court precedent. Didn't Phoenix have a reversionary interest as it was described in the CDOs? And isn't that worth something? Phoenix does not have a reversionary interest. It granted away all right title and interest that it had to the indenture trustee. But it comes back to them, doesn't it come back? No, your honor. It does not come back to them. And that's at pages. So it's at ECF 324-754, section 9.2. This is the Phoenix light memorandum. And it says that the interest just passes through and goes on. There is a reversionary interest. If there is a collateral left over, it does not go to them. No, it does not go to them. And that is, by the way, as a basis for an article three injury, not that you have to decide whether they have article three standing to decide this champerty issue, this prudential standing issue. But that is completely speculative. It's a future injury under the Supreme Court's case law. It has to be certain and imminent, discussed most recently in TransUnion versus Ramirez. The fundamental problem here is that plaintiffs were obtained assignments of just litigation rights. And by the way, I do want to address this conflict issue, if I could just have a moment on this. And that is, he plaintiffs rather than indenture trustees is not actually a non-litigation purpose. And Justinian is directly on point on that. And we explained that in our brief. And in the reply brief, they don't even try to respond to the Justinian point. And this is the easier case, I think, than Justinian, because Justinian at least acquired the underlying debt instrument and the claims. And here they just acquired claims for the purpose of litigation, as their witness admits. And all of this is explained in our brief. And they ignore it in the reply brief. And the only evidence is that this was done because plaintiffs had a desired issue. Plaintiffs contacted trustees 12 days before filing the lawsuit to ask for assignments for the purpose of litigation and only for the purpose of litigation. And so the district court on this unique record, given what plaintiffs' witnesses admitted, given plaintiffs' litigation strategy, and given what plaintiffs chose to argue in opposition to summary judgment, was clearly correct to grant summary judgment to U.S. Bank. And respectfully, this court should affirm. Thank you, Mr. Chief. Mr. Maher, you've reserved some time. Yes, Your Honor. Two minutes. Your Honor, Phoenix Light is the controlling bondholder of each of the CDOs. It had the power to direct the trustees to assign the claims to it. It clearly has an economic interest in this transaction. So counsel's statement is just wrong. What we are asserting is that we were reassigned the trustees' claims. So we are not only asserting the claims that we had for the moment that we had the assets before we transferred them to the trustee, we are asserting the trustees' claims. And we have a right to do that unless they're champertists. And the issue of champerty comes down to whether or not we're a stranger to the transaction. We are not a stranger to the transaction. We are integral to all these transactions. Tell me what interest you retained. That's the question I asked opposing counsel as well. Describe it for me. Sure. We have obligations under the CDO indentures. We have to pay principal and interest as a result of the RMBS certificates to the bondholders through the lockbox of the trustees. We have a right and an obligation to protect the collateral. We've referred to that at page 36 of our brief. We have obligations under the CDO indentures in order to protect the collateral and to defend the rights to the collateral. We ourselves get a reversionary interest when the bondholders are paid off, the lien is released by the trustee, and the assets, the RMBS certificates revert to us. Now, the fact that we then put the money through the waterfall and give it back to other people, the US Supreme Court says is irrelevant in Sprint. It doesn't matter where the money goes afterwards. Others never have standing. Where did the Supreme Court say that? It was Sprint. In fact, the line was quoted by Judge Kopernikus for this court in Huff saying, what does it matter what they do with the proceeds afterward? That's the quote from the US Supreme Court case, meaning a pass-through entity has standing and it doesn't matter. But I want to make one last point if I could, which is separate doctrines. If the New York Court of Appeals cited LIMPAR Realty and Prudential Oil in a string site of cases they cited with approval, we have a closer relationship. The part of the issue is, if you have a relationship with your assigner, it's outside the scope of championing. That's Prudential Oil. If you have a proprietary financial economic business interest, it's also outside the scope of championing, and that's LIMPAR Realty. It doesn't matter if the transfer was for a litigation purpose. That's what love funding holds, and this court, as a matter of law, ruled despite Judge Shindlin finding a championing intent that they were buying a lawsuit. This court held as a matter of law, it does not matter. The transfer was not championing because there was a pre-existing proprietary interest. We are asserting the trustees' claims. The only thing that they're saying is they're championing, and the standard is much, much lower for championing than for Article III standing. Thank you very much, Mr. Maher. Thank you, Your Honors. We'll reserve the decision.